**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Marie Gaus, | No. CV-13-02456-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Linda Marie Gaus seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied her disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed.

**I.   BACKGROUND**

Plaintiff was born in July 1961.  She has had petit mal seizures since eighth grade. Plaintiff graduated from a one-year college program as a home health caregiver and worked as a home health caregiver for many years.  In December 2007, Plaintiff's employment was terminated when she broke her arm, her husband was out of town, and she accepted an invitation to stay with the patient for whom she was providing care.  She alleges disability beginning December 8, 2007.

In 2009, Plaintiff first reported experiencing vertigo. In June 2010, when asked to describe how her symptoms prevented her from carrying out her normal workday, Plaintiff said "dizziness sometimes (vertigo)," her medicine made her very tired and caused diarrhea, and she did not work. She reported that on an average day she showers, gets dressed, does laundry, goes shopping, washes dishes, prepares meals, feeds her dogs, and does housecleaning. She said she can walk about a half mile, and she no longer drives. She said she assisted with trimming bushes outside her home. Plaintiff also reported having several seizures a month during which she did not lose consciousness.

On May 19, 2010, Plaintiff applied for disability insurance benefits and supplemental security income. On September 27, 2011, Plaintiff appeared with her attorney and testified at a hearing before the ALJ. An impartial vocational expert also testified. On January 13, 2012, the ALJ issued a decision that Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision. On December 2, 2013, Plaintiff sought review by this Court.

## II.   STANDARD OF REVIEW

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted); *accord Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").

### III.     FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

At step one, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2012, and that she has not engaged in substantial gainful activity since December 8, 2007. At step two, the ALJ found that

Plaintiff has the following severe impairments: seizures and vertigo. At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Plaintiff:

> has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant cannot use ladders, ropes or scaffolds. Furthermore, the claimant should avoid even moderate exposure to hazards, including dangerous machinery and unprotected heights. The claimant is further limited because she must commute to and from work using public transportation. The claimant, moreover, cannot work in a fast-paced production environment. She can attend and concentrate for two hours and then must take a customary ten to fifteen minute break. She can then attend and concentrate for two more hours then must take the customary thirty to sixty minute lunch break. She can then attend and concentrate for two hours before taking a customary ten to fifteen minute break. She can then attend and concentrate for two more hours, and that ends the normal eight hour workday.

The ALJ further found that Plaintiff is capable of performing past relevant work as a home health caregiver.

## IV. ANALYSIS

### A. The ALJ Did Not Err in Evaluating Plaintiff's Credibility.

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis: (1) determine whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). In making a credibility determination, an ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the claimant's allegations." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (internal

quotation marks and citation omitted). But "an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." *Id.*

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. Then, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment, *i.e.*, that Plaintiff can perform medium work with customary breaks after two hours, but not in a fast-paced production environment or around hazards. The ALJ concluded that Plaintiff had magnified her alleged symptoms of petit mal seizures and vertigo.

The ALJ found that Plaintiff's allegation that vertigo was one of the reasons she was unable to work beginning in December 2007 was not supported by the record. Plaintiff testified that since December 2007 she has had seizures more frequently and she suffers vertigo three to four times a week, sometimes up to eight hours in duration. The ALJ found, however, that Plaintiff's vertigo did not begin until the summer of 2009, based on record evidence and Plaintiff's attorney's admission.[1] Therefore, from December 2007 until the summer of 2009, Plaintiff's only alleged impairment is petit mal seizures.

---

[1] Although Plaintiff testified that vertigo was the second worst problem preventing her from working in December 2007, her error was corrected shortly thereafter. The hearing decision states that her representative "candidly admitted the claimant's vertigo did not start until 2009." But Plaintiff also readily admitted her vertigo did not begin until 2009. Her initially incorrect testimony is relevant to her credibility to show whether she is a reliable historian, but does not establish that she exaggerated symptoms. Even if the ALJ erred in his interpretation of her response, Plaintiff has not shown that any such error is harmful because the ALJ identified multiple reasons for discrediting Plaintiff's subjective symptom testimony that are supported by substantial evidence. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).

The ALJ identified specific record evidence demonstrating that Plaintiff's seizures were under fair or good control during much of the relevant period. In December 2007, Plaintiff saw her neurologist, Harry S. Morehead, Jr., M.D., and reported she had had no seizures since approximately May 2007. In March 2008, Dr. Morehead reported she still had had no seizures since May 2007 and her seizures seemed to be well controlled. In June 2008, Dr. Morehead reported Plaintiff had three brief seizures in April and May 2008, the first seizures she had had since May 2007. In July 2008, Dr. Morehead reported Plaintiff was not aware of having had any definite seizures since May. In September 2008, Plaintiff reported a seizure in August, and Dr. Morehead increased the dosage of her Keppra prescription. In December 2008, Dr. Morehead did not change Plaintiff's medication because she had not had a seizure since September. He reported that her "spells are partial seizures and are relatively mild, associated with laughing." In March 2009, Dr. Morehead reported Plaintiff had had no seizures since 2008, and they were minor and well controlled. He also reported that he agreed with Plaintiff that her epilepsy was not severe enough at the time to require surgery.

In October 2009, Dr. Morehead reported that Plaintiff was having vertigo attacks with nausea and vomiting, possibly caused by the Keppra or some type of gastrointestinal problem. In November 2009, Plaintiff had a bout of dizziness and vertigo, with nausea and vomiting for about 18 hours, and Dr. Morehead suggested reducing the Keppra. In January 2010, Dr. Morehead reported that reducing the Keppra had been helpful; since November Plaintiff had only experienced a slight onset of dizziness on January 28, 2010. Her last seizure was also near the end of November and "was one of her minor ones as usual." In March 2010, Dr. Morehead reported that Plaintiff had had one or two seizures since January, each lasting "only a couple of minutes," and she had had about one vertigo attack every week or so, each lasting 48 hours. He also reported that it appeared that Plaintiff had about the same frequency of seizures on or off the Keppra, and she did not miss work previously with the seizures. He recommended gradually discontinuing the Keppra.

In April 2010, Plaintiff experienced three seizures and a reoccurrence of vertigo. On June 21, 2010, Dr. Morehead restarted the Keppra. On July 1, 2010, Dr. Morehead reported Plaintiff's last seizure was on June 19, her seizures are minor, and "her vertigo continues from time to time." In November 2010, Plaintiff called Dr. Morehead for prescription refills and reported a minor seizure on November 13 and continued vertigo. On February 1, 2011, Dr. Morehead saw Plaintiff for the first time since July 2010. Plaintiff reported that she had had seven seizures in July, one in August, one in November, and two in January. He also reported that Plaintiff's vertigo "restarted this month and has occurred about 4 times." In May 2011, Dr. Morehead reported that Plaintiff brought in a "diary showing only 7 rather minor seizures since February 8" and that "her vertigo has not been quite so severe."

On August 4, 2011, Dr. Morehead reported that on July 30 Plaintiff "had a moderately severe attack of vertigo, associated with nausea and vomiting." He said that her vertigo attacks had "become a significant problem." He described Plaintiff's seizures as "minor spells often accompanied by laughing or nonsensical speech that lasts a few seconds followed by confusion," occurring two to three times a month, lately at or just after bedtime. Dr. Morehead also reported that Plaintiff did not have any warning before a spell and did not know that she had had them.[2] On August 17, 2011, Plaintiff saw her primary care physician, who noted "her seizure disorders are doing well" and "her vertigo has been acting up a little bit, other than that she is doing well."

On September 30, 2011, Plaintiff began treatment with a different neurologist, who noted: "Patient complains of vertigo in the past 2 years and makes her nauseous. . . . It occurs two to three times a week and it can last up to 8 hours." The ALJ found it suspicious that before the September 2011 hearing Plaintiff did not complain about

---

[2] Plaintiff testified that she only knows that she has seizures because her husband tells her afterward.

serious vertigo attacks, but after the hearing she complained of numerous vertigo attacks, lasting up to eight hours.

The ALJ also found that Plaintiff's medical history and examination findings in the record did not confirm her allegations. He found that, although Plaintiff had suffered from seizures most of her life, she never had any convulsive seizures, and her seizures were characterized as brief. Further, they usually occur at or just after bedtime, so they likely would not interfere with Plaintiff's ability to work during a normal daytime workday. The ALJ found the record showed Plaintiff's seizures were present at approximately the same level of severity before the alleged onset date. The fact they did not prevent Plaintiff from working before December 2007 suggested that they would not have prevented her from working after December 2007.

The ALJ further found that the medical records showed that prescribed medications had been relatively effective in controlling Plaintiff's symptoms for her alleged impairments. Thus, substantial evidence supports finding that the ALJ provided specific, clear, and convincing reasons for discrediting Plaintiff's subjective symptom testimony.

**B.      The ALJ Did Not Err by Failing to Recontact Dr. Morehead for an Opinion.**

Plaintiff contends that the ALJ committed legal error by failing to "recontact" Dr. Morehead for an opinion regarding Plaintiff's functional capabilities. Although Plaintiff refers to "recontacting," the record does not show that the ALJ ever contacted Dr. Morehead directly. The record also does not show that Plaintiff requested the ALJ to contact or subpoena Dr. Morehead for an opinion.

The ALJ has a special duty to fully and fairly develop the record and assure that the claimant's interests are considered, even when the claimant is represented by counsel. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). An ALJ may stop a hearing temporarily and continue it at a later date if he believes that there is material evidence missing at the hearing. 20 C.F.R. § 404.944. The ALJ may also reopen the hearing to

receive new and material evidence at any time before he mails a notice of the decision. *Id.* However, an "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).  An ALJ has no duty to request more information from treating physicians where substantially all of their medical records for the relevant period are before the ALJ and none of the evidence is unclear or ambiguous.  *Id.* at 884.

On March 8, 2010, Dr. Morehead wrote:

> Social Security disability is being applied for with the help of an agency and I filled out those forms today.  The patient has about the same frequency of seizures on or off the Keppra it appears, and did not miss work with them previously.  The problem of course is that she is unable to obtain a driver's license.

He also wrote, "I completed the paperwork to assist in her social security disability, but it appears that the vertigo is more of a disabling problem frequency-wise than seizures." The record does not indicate what paperwork Dr. Morehead completed.  During the hearing on September 27, 2011, Plaintiff's counsel said she thought Dr. Morehead referred to "some sort of questionnaire," but she was not sure that it was included in the record.

Later during the hearing, the ALJ said he would keep the record open for Plaintiff to submit her vertigo log, her seizure log, and all of the updated medical records from Dr. Morehead.  The ALJ then said, "I think that's the only way I'll be able to make a proper evaluation in this case."  At the end of the hearing, the ALJ asked Plaintiff's counsel if she would be able to get the information he identified to him by October 14, 2011, and counsel said she believed so.  The ALJ then said if she could not get all of the information in by October 14, she should send a motion asking for more time and assume it is granted, but she should not send items piecemeal.  The ALJ repeated that he wanted the seizure log, the vertigo log, and all updated Dr. Morehead records.  Plaintiff's counsel previously had mentioned that Plaintiff and her significant other had completed "seizure

1  questionnaires," which were in the record. At the end of the hearing, Plaintiff's counsel
2  said she had found "the questionnaire" from Dr. Morehead, and the ALJ said to send it
3  with the other missing evidence. The ALJ then asked, "And you said there was a seizure
4  questionnaire?" Counsel responded, "Yes. This would be part of Dr. Morehead's
5  records that he sent." The ALJ stated that the records were incomplete. He then
6  summarized that counsel was to submit "seizure log, vertigo log, updated Morehead
7  records, a seizure questionnaire" and asked Plaintiff's counsel if there was anything else
8  he needed to keep the record open for. Counsel responded, "I don't think so."

On October 27, 2013, Plaintiff's counsel requested an additional 21 days to secure and submit post-hearing medical evidence. She said medical records from Dr. Ahmadieh had been requested but not yet received. She did not mention Dr. Morehead, and she did not request that the ALJ subpoena Dr. Morehead for a medical source statement. In the hearing decision dated January 13, 2012, the ALJ noted that the record remained open following the hearing for the submission of additional medical records, and the additional records were received and admitted as Exhibits 8F, 9F, and 10F. The ALJ also stated that Dr. Morehead noted that he filled out disability paperwork, but there was no medical source statement from Dr. Morehead in the record, and the record was left open after the hearing to obtain such a statement.

Although it is unclear what Dr. Morehead meant when he said he had completed disability "forms" and "paperwork" and what Plaintiff's counsel meant when she said she had found "the questionnaire" from Dr. Morehead, the ALJ gave Plaintiff ample time and opportunity to obtain a medical source statement from Dr. Morehead regardless of whether he had completed one previously. Moreover, all of Dr. Morehead's treatment records were submitted and considered by the ALJ, and they were not unclear or ambiguous. Dr. Morehead did not observe Plaintiff's seizures or vertigo. He described her seizures as infrequent "minor spells" that had not changed significantly after December 2007, and he did not think her vertigo was a significant problem until August

2011. Therefore, the ALJ did not err by failing to "recontact" Dr. Morehead for an opinion regarding Plaintiff's functional capabilities.

### C. The ALJ Did Not Err by Giving Some Weight to the Opinions of Non-Examining State Agency Physicians or by Giving Significant Weight to Dr. Hurd's Opinion.

Plaintiff contends the ALJ erred by giving some weight to the opinions of non-examining State agency physicians because opinions of treating physicians are to be given greater weight and the record reviewed by the non-examining physicians did not include an opinion from treating physician Dr. Morehead. As concluded above, Dr. Morehead may not have given an opinion regarding Plaintiff's functional capabilities, Plaintiff had opportunity to submit it or obtain one, and Dr. Morehead's records are complete and unambiguous. The ALJ acknowledged that the opinions of non-examining physicians generally do not deserve as much weight as those of treating or examining physicians and found these to be deserving of some weight because there were a number of other reasons to reach similar conclusions.

Plaintiff also contends that the ALJ committed legal error by giving significant weight to consultative examiner Dr. Richard Hurd's opinion that she was capable of work-related activities and of doing her past work as a home care attendant because "the Commissioner will not give 'any special significance' to the source of an opinion on issues reserved to the Commissioner" and because his "opinion states nothing of Plaintiff's functional capabilities." Both contentions are incorrect.

The Commissioner has final responsibility for determining whether a claimant meets the statutory definition of disability, and a statement by a medical source that the claimant is "disabled" or "unable to work" is not controlling. 20 C.F.R. §§ 404.1527(d), 416.927(d). The Commissioner considers opinion evidence along with other evidence regarding the nature and severity of a claimant's impairments and a claimant's residual functional capacity, but the Commissioner does not give any special significance to the source of an opinion on such issues. *Id.* In other words, an opinion from a treating

source on such issues is not given greater weight than one from a non-treating source. Thus, the ALJ did not err by considering Dr. Hurd's opinion on issues reserved to the Commissioner just as he would such opinions from other sources, considering its consistency with Plaintiff's statements and with the objective evidence, without abdicating his responsibility for deciding the ultimate issue of whether Plaintiff is capable of performing her past relevant work as a home health caregiver.

Further, Dr. Hurd's examination report stated a great deal about Plaintiff's functional capabilities. On August 7, 2009, Dr. Hurd examined Plaintiff and wrote a detailed examination report. He said "she freely admits that she is able to do all activities of daily living to include cooking, laundry, grocery shopping, cleaning house, doing the dishes." Dr. Hurd said that Plaintiff "says she can walk for long periods of time, stand for prolonged periods of time, and also has no trouble sitting." He also reported that Plaintiff said she could lift ten to twenty pounds comfortably. Dr. Hurd observed that Plaintiff moved easily on and off the examination table and between sitting and supine positions without any evidence of discomfort. Based on his observations, he stated that she was able to perform all of the physical exam maneuvers with very little effort or difficulty. He noted that testing of the shoulder muscles "revealed a very strong individual, 5/5 bilaterally." He found normal range of motion in Plaintiff's shoulders, wrists, hips, ankles, and feet.

Dr. Hurd also said Plaintiff reported that she had seizures about once or twice a week and they last for 20 to 30 seconds. He concluded:

> Based upon the claimant's history, the physical exam, and also my careful observation of the claimant, it is my professional opinion that Ms. Gaus is capable of work-related activities. Apparently she has had petit mal seizures since she was in the 8th grade with a similar pattern, and she has been able to work at least 16 to 18 years. Apparently in the past worked [sic], even though she has petit mal seizures, they have not interfered with her work as a home care attendant. I feel that she is certainly capable of doing this activity at this time.

The ALJ said he gave significant weight to Dr. Hurd's opinion because it was consistent with the history described by Plaintiff as well as with his examination results.  Even though the ALJ gave "significant weight" to Dr. Hurd's opinion, the ALJ gave Plaintiff "the benefit of the doubt" and found her to be more limited than did Dr. Hurd.  The ALJ did not err in his consideration and weighing of Dr. Hurd's examination report.

### D. The ALJ Did Not Err by Relying on an Incomplete Hypothetical Question to the Vocational Expert.

Plaintiff contends the ALJ erred by relying on the vocational expert's opinion that Plaintiff is capable of performing her past relevant work as a home health caregiver because the hypothetical posed to the vocational expert did not include limitations that Dr. Morehead may have opined.  The hypothetical included all of the limitations supported by Dr. Morehead's medical records.  Thus, the ALJ did not err by relying on the vocational expert's opinion.

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is affirmed.  The Clerk shall enter judgment accordingly and shall terminate this case.

Dated this 31st day of October, 2014.

Neil V. Wake
United States District Judge